Rocco J. Pascarella, Respondent, v City of New York et al., Appellants.

First Department, March 16, 1989

### APPEARANCES OF COUNSEL

*Norman E. Frowley* of counsel *(Morris J. Eisen, P. C.,* attorney), for respondent.

*Ellen B. Fishman* of counsel *(Stephen J. McGrath* with her on the brief; *Peter L. Zimroth, Corporation Counsel,* attorney), for appellants.

### OPINION OF THE COURT

MILONAS, J.

The instant action was commenced by a New York City police officer to recover damages for personal injuries sustained by him when a terrorist bomb exploded outside police headquarters at One Police Plaza in downtown Manhattan. Defendants-appellants City of New York and the New York City Police Department appeal from a judgment of the Su-

preme Court entered upon a jury verdict in favor of plaintiff in the amount of $1,750,000 plus interest, costs and disbursements. Following the verdict, defendants unsuccessfully moved for an order setting aside the verdict (135 Misc 2d 719). An examination of the record herein reveals that the evidence at trial does not establish any liability on the part of the municipality, and, accordingly, the judgment should be reversed and the complaint dismissed.

This case involves the second of four bombs that exploded on New Year's eve of 1982 in lower Manhattan and Brooklyn. The bombs were planted by the FALN, a Puerto Rican terrorist group. The particular device in question here was placed outside a closed entrance on the north side of police headquarters, situated in a 16-story, brick building owned by the City of New York. One Police Plaza, the site of the structure, is located less than half a mile from 26 Federal Plaza, where the first bomb went off. A third bomb later exploded at St. Andrew's Plaza and the fourth at the United States Courthouse for the Eastern District of New York in Brooklyn. On the night of the bombings, plaintiff Rocco J. Pascarella, a veteran of approximately 12 years of service in traffic control, was assigned to the Fifth Precinct as a member of the Headquarters Security Unit (HSU) to which he had been transferred at his own request some two weeks previously. Although plaintiff underwent a three-day orientation session with respect to the various posts around the headquarters building, he never received any specialized training in detecting or handling explosive devices.

Anonymous bomb threats are apparently a frequent occurrence at police headquarters, but there is no indication that a bomb had ever actually exploded at Police Plaza prior to the present incident. Yet, anonymous warnings are treated seriously by the Police Department, which has developed a standard procedure to deal with such threats. Thus, when a bomb warning is called in, ordinary patrol officers are sent to the scene, and any police officer can search for suspicious packages that might contain explosive devices. Only members of the Emergency Services Unit, however, are supposed to touch or disturb an explosive device. Consequently, if a police officer discovers a possible explosive device, he is required to notify his superior officer who, in turn, must contact the Emergency Services Unit. This procedure is outlined in the officer's Patrol

Guide and is also part of the normal training instruction provided to all police officers. In addition to the Emergency Services Unit, the Police Department has a special Bomb Squad.

It is the function of HSU members to maintain a high level of security at, and around the perimeter of, One Police Plaza for the protection of both the employees of the Police Department and the public. At the beginning of each tour of duty, the HSU police officers are assigned to various numbered posts, which may be either inside or outside of police headquarters. Sergeant John J. Cashman, who was plaintiff's supervisor on the night of December 31, 1982, assigned plaintiff to post 5, which extends along Madison Street adjacent to the headquarters building. Outside posts, such as numbers 4, 5 and 6, are roving posts as opposed to fixed posts where the officers largely remain at the same spot. Prior to sending plaintiff out to perform a perimeter check, Sergeant Cashman did not call for assistance from the Emergency Services Unit since there had not been any recent warning that a bomb was set to go off at police headquarters nor was there a report of any suspicious packages. He was aware that an explosion causing no injuries had taken place at nearby Federal Plaza and communicated that fact to the officers under his command. Sergeant Cashman, therefore, advised his officers to be careful and indicated that there could be another bomb planted in the vicinity of the police building. He was unable to convey this information personally to plaintiff, who was then on a meal break, but directed another officer to relay the appropriate message to plaintiff.

After plaintiff was given his instructions by the other officer at about 9:45 P.M., he began to conduct a perimeter check of police headquarters. In that regard, he left the building through the main entrance and walked toward the north entrance where he observed a quantity of garbage at the top of the stairs. An accumulation of paper bags and other refuse in that area was not at all unusual. While there were lights around the building, it was dark, and plaintiff used a flashlight. He noticed a bag some 10 to 15 feet away and started up the stairs to get a closer look. When he was approximately two feet from the bag, he saw that it contained a Kentucky Fried Chicken box and concluded that the object was simply

another piece of garbage. Plaintiff thereupon turned to walk away, and his next recollection was of being in the hospital. The bomb, which detonated at 9:55 P.M., resulted in extensive damage to the entrance area. Plaintiff was found lying on the ground, his left lower leg having been blown off; he had also sustained other injuries.

In delivering his charge to the jury at the conclusion of the trial, the Judge quoted certain excerpts from one of the exhibits, a manual entitled "A Functional Guide for Fire Security Officers and Deputy Fire Security Officers." According to the court, "[i]f you find that the defendants violated any of these paragraphs that I read to you of these regulations, you may consider those violations as evidence of the breach of the duty of care, meaning negligence, that is owed or that was owed to Mr. Pascarella, provided further that such a violation was a proximate cause of the accident". The Functional Guide had been prepared by Sergeant Allan Wecker under the auspices of Lieutenant Thomas V. O'Reilly, who was the commanding officer of the HSU from January 1976 through January 1979. This guidebook was intended to establish a uniform set of procedures for officers to follow in the event of a fire, explosion or bomb threat at police headquarters. One of the main purposes in formulating this booklet was to protect the safety of police officers and other occupants of One Police Plaza.

Lieutenant O'Reilly testified at trial that, in his opinion, the situation existing on the night of December 31, 1982 presented the sort of "unusual circumstance" referred to in the Functional Guide warranting the notification of the Emergency Services Unit or even the Bomb Squad. Moreover, Officer Jose Landrau stated that the Emergency Services Unit, the Bomb Squad or the Arson Explosion Squad were all better equipped to search for bombs than the HSU. Plaintiff also called as a witness Kenneth J. Dudonis, a former detective with the New York City Bomb Squad and current director of the Criminal Justice Institute. In the view of Dudonis, it was a violation of accepted police procedure to send an individual such as plaintiff, who was unfamiliar with the area, to undertake a perimeter search, and it was also against proper security planning to permit debris to accumulate outside of police headquarters.

The portions of the Functional Guide which the court included in its instructions to the jury are as follows:

"Search Procedure in the Event of a
Bomb Threat

"1. In the past, an overwhelming percentage of bomb threats have turned out to be just threats. However, in the past decade the trend is that more of these threats are materializing into actual bombings. In its initial stage it is practically impossible to determine whether a bomb threat is meant to be a form of verbal harassment or an instrument of physical destruction. Therefore, in order to give optimum consideration toward the safety of our employees, it is imperative that we treat every threat as the real thing, until it can be determined otherwise.

"2. A practical and effective approach to a bomb threat is to have the building searched by personnel familiar with the specific areas to be searched. The terrorist does not label the bomb with the words 'Bomb' or 'Explosives'. More often the bomb is secreted to blend with the environment. A bomb can be camouflaged in many ways. Some devices may be the size of a pack of cigarettes, others the size of a suitcase. The object of the search can vary in size and shape. Therefore, areas that are to be searched should be searched by employees that are familiar with the area, so that anything foreign or new to that particular premises may be easily spotted. * * *

"10. In the event of a 'bomb threat' of an impending serious nature, or if any unusual circumstances dictates, additional personnel shall be requested for perimeter patrol from the Fifth Precinct.

"11. If a search of the building produces *positive results* and a suspected explosive device is *found* the Fire Safety Director shall * * *

"(B) Have the Emergency Service Unit standing by, respond to the location of the suspected device."

■ In denying defendants' subsequent motion to set aside the verdict, the trial court stated that while a governmental entity, when acting in its official capacity, does not generally have a duty to protect specific individuals from the criminal acts of third persons, there are instances where the principle of sovereign immunity does not apply as, for example, under circumstances in which a special relationship has been created between the municipality and the injured party. In that regard, the court declared that "[b]ased on the evidence presented by plaintiff and an analysis of the special duty exception, I concluded that a special relationship existed between

Officer Pascarella and the police department" (135 Misc 2d 719, 724, *supra).* According to the court, the Functional Guide, which "contained specific procedures to be followed in the context of an emergency situation which occurred on the night when Officer Pascarella was injured", was "promulgated for the benefit of a specific group of persons a member of which was Officer Pascarella" *(supra,* at 725) and that the officer relied to his detriment upon that special relationship. The court also determined that regardless of whether defendants owed a special duty to plaintiff, the City of New York could, as a landowner, be held liable for damages sustained by plaintiff by failing to maintain its property in a reasonably safe condition and allowing debris to collect in the vicinity of One Police Plaza notwithstanding that defendants knew that the area was a potential bomb site for terrorist groups. The relevant legal authority, however, does not support either the verdict of the jury or the finding of the trial court.

The law is well settled that "[p]ublic entities remain immune from negligence claims arising out of the performance of their governmental functions, including police protection, unless the injured person establishes a special relationship with the entity, which would create a specific duty to protect that individual, and the individual relied on the performance of that duty" *(Miller v State of New York,* 62 NY2d 506, 510; *see also, Cuffy v City of New York,* 69 NY2d 255; *Napolitano v County of Suffolk,* 61 NY2d 863; *Bardavid v New York City Tr. Auth.,* 61 NY2d 986; *De Long v County of Erie,* 60 NY2d 296; *Vitale v City of New York,* 60 NY2d 861; *O'Connor v City of New York,* 58 NY2d 184; *Weiner v Metropolitan Transp. Auth.,* 55 NY2d 175; *Florence v Goldberg,* 44 NY2d 189). In order to make out a prima facie case of negligence, a plaintiff must, in addition to showing a specific duty owed by the defendant to the plaintiff, also demonstrate a breach of that duty and that the injury was the proximate result therefrom *(Solomon v City of New York,* 66 NY2d 1026; *Iannelli v Powers,* 114 AD2d 157, *lv denied* 68 NY2d 604). Moreover, when an intervening act contributes to plaintiff's injuries, liability depends upon whether the intervening act is a normal or foreseeable consequence of defendant's negligence *(Boltax v Joy Day Camp,* 67 NY2d 617; *Derdiarian v Felix Contr. Corp.,* 51 NY2d 308).

In *Cuffy v City of New York (supra)* the Court of Appeals, in recognizing the existence of a special relationship between the municipality and the plaintiff as providing a limited exception

to the general immunity of governmental entities from negligence claims (that particular case involved injuries allegedly resulting from the city's failure to furnish adequate police protection), described the elements of such a special relationship as being "(1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction would lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking" (at 260). Thus, a governmental entity "has no duty to control the conduct of third persons so as to prevent them from harming others, even where as a practical matter defendant can exercise such control" *(D'Amico v Christie,* 71 NY2d 76, 88; *see also, Bardavid v New York City Tr. Auth., supra; Weiner v Metropolitan Transp. Auth., supra; Satiro v City of New Rochelle,* 102 AD2d 821, *affd for reasons stated at App Div* 64 NY2d 614). Although it is true that certain relationships (for example, the doctrine of respondeat superior in which an employer may be liable for acts committed by its employees in the scope of their employment) could give rise to responsibility on the part of the municipality, "[w]hatever else may be required, however, at the minimum such a duty requires an existing relationship between the defendant and the third person over whom 'charge' is asserted" and "[b]y the same token, such a duty of necessity must be limited to conduct that defendant may reasonably control" *(D'Amico v Christie, supra,* at 89).

The Court of Appeals has rejected an attempt by police officers, injured while endeavoring to subdue an escaped mental patient, to recover damages against the State of New York for its purported negligence in connection with the patient's escape *(Santangelo v State of New York,* 71 NY2d 393). As the court asserted in *Santangelo v State of New York (supra),* the "long-standing common-law rule that firefighters * * * cannot recover against the property owners or occupants whose negligence in maintaining the premises occasioned the fires" (at 396) is also applicable to police officers injured in the line of duty. The court pointed out that "persons who choose to become firefighters assume the risks of fire-related injuries", and "[l]ike firefighters, police are the experts engaged, trained and compensated by the public to deal on its behalf with emergencies and hazards often created by negligence, and like firefighters they generally cannot recover damages for negli-

gence in the very situations that create the occasion for their services" *(supra,* at 397).

Indeed, in the infrequent instances in which a special relationship has been found to exist between the claimant and the governmental entity, the former was never an employee of defendant municipality but a member of a group to whom that municipality had voluntarily assumed the performance of a specific duty. Therefore, where defendants city and county had established a special "911" telephone number for emergency assistance and had assured decedent, who was killed by a burglar in her home after she had dialed "911", that help was on the way, a representation upon which she relied to her detriment, a special relationship had been established between plaintiff and defendants so as to render the latter liable for their failure to exercise ordinary care in processing and responding to decedent's call *(De Long v County of Erie, supra).* Similarly, a municipality whose police department had voluntarily agreed to supervise school crossings, an assumption of duty relied upon by the parents of the school children, thereby creating a special relationship between the city and plaintiff, could be held liable for injuries suffered by a child as a result of the government's negligent omission to supply a guard at one of the crossings or to notify the school principal or to take appropriate action to safeguard the children *(Florence v Goldberg, supra).*

■ There is certainly no basis in either statutory or common law for generally permitting a police officer injured in the course of his employment to recover damages from the governmental entity employing him. In *Santangelo v State of New York (supra),* the Court of Appeals explained that "[n]or are police officers left unprotected by such a rule. They receive both training that enables them to minimize the dangers their occupation requires them to face, and compensation and special benefits to help assure that the public will bear the costs of injuries suffered by its protectors in the line of duty" (at 397-398). The court proceeded to note that the "anomaly" inherent in allowing recovery against the State for line-of-duty injuries "would result in the payment of damages by the public for injuries sustained by the experts it employs to deal with such situations" *(Santangelo v State of New York, supra,* at 398). Clearly, individuals who elect to join the uniformed services do so with knowledge of the dangers attendant upon those occupations and the distinct possibility that they might be hurt in the course of their employment. It is precisely

because being a police officer is so hazardous that the Legislature has provided for added benefits to those injured in the line of duty.

Plaintiff contends, and the trial court agrees, that the Functional Guide for Fire Security Officers and Deputy Security Officers created a special relationship between police officers such as plaintiff herein and the Police Department such that violations of that guide could constitute evidence of negligence by defendants. Yet, "[a]bsent a special relationship creating a municipal duty to exercise care for the benefit of a particular class of individuals, no liability may be imposed upon a municipality for failure to enforce a statute or regulation" *(Sanchez v Village of Liberty,* 42 NY2d 876, 877-878; *see also, Kenavan v City of New York,* 70 NY2d 558, 568; *O'Connor v City of New York,* 58 NY2d 184, 189). In the instant matter, there was not even a statute or any agency rules and regulations at issue; the Functional Guide was merely a manual composed by a police sergeant at the direction of a police lieutenant, which laid out recommended internal procedures to be followed in the event of certain contingencies. There is absolutely no authority for the proposition that internal agency procedures, no matter how they are prepared, whether compiled into a booklet or not, and whether approved by top command officials or not, somehow become mandatory in nature so that any deviation therefrom subjects the governmental entity in question to civil liability. The notion that an agency creates a special relationship with its employees which could cause it to be liable to them for negligence whenever it adopts internal policies and procedures to which it does not thereafter rigidly adhere not only strains all reason, but would severely circumscribe the effective functioning of governmental entities.

■ In *Vitale v City of New York* (60 NY2d 861, *supra),* the Court of Appeals determined that an industrial arts teachers at a junior high school, who was assaulted by a student as he sought to break up an altercation in the hallway of the school, was not owed a special duty by the Board of Education when it promulgated a detailed security plan. In the opinion of the court, liability could not be imposed upon the Board for its failure to enforce its own security rules since "[n]othing in the adoption or content of the plan warrants a finding that it was designed or intended specifically for his benefit or that of other teachers in the school. They stood as its beneficiaries in exactly the same position as students, other personnel in the

school system, and members of the public who came on the school property. We reject his [plaintiff's] contention that because the teachers had a role to play in the implementation of the plan they were somehow thereby converted into its special beneficiaries" *(supra,* at 863). In that same regard, it is impossible to discern how the Functional Guide, which details uniform procedures to be undertaken whenever the possibility of a fire or explosion arises, established a special duty of care towards plaintiff herein anymore than it did toward any member of the public, much less that plaintiff justifiably relied to his detriment upon that duty.

There are other problems involved in relying upon the Functional Guide as supporting the creation of a special relationship between plaintiff and defendants. For one thing, the instructions in this manual largely concern a search of the police headquarters building, not an inspection of the perimeter. For another, the Police Department had not received a bomb threat on the night of December 31, 1982. While the police were in possession of information that a bomb had exploded at nearby 26 Federal Plaza, they had no more reason to believe that another bomb had been planted at One Police Plaza than at any other government building or, for that matter, anywhere else in the city. Sergeant Cashman did advise the officers under his command to be careful, but the procedures outlined in the Functional Guide certainly did not require him to request the assistance of the Emergency Services Unit or the Bomb Squad on the basis of the situation then in existence. Moreover, any police officer can conduct searches for suspicious packages; only trained personnel may touch or disturb a potential explosive device. There was no violation in sending plaintiff out to perform a perimeter search; it was part of his regular job responsibility as a member of HSU to do so. All plaintiff undertook, and all he was requested to do, was to have a look around, and this is what he did. He never touched the Kentucky Fried Chicken box and, in fact, was walking away from it when the explosion occurred. Plaintiff was, unfortunately, simply in the wrong place at the wrong time.

There was testimony at trial to the effect that under the unusual circumstances existing that night, the Emergency Services Unit or even the Bomb Squad should have been notified. However, a governmental entity is not chargeable with negligence for failing to exercise perfect judgment, and the sort of policy determinations which are of a discretionary

or quasi-judicial nature are insulated from liability *(Kenavan v City of New York, supra; Eiseman v State of New York,* 70 NY2d 175; *Tarter v State of New York,* 68 NY2d 511; *Tango v Tulevech,* 61 NY2d 34). At most, it can be claimed, and even this is not at all apparent, that Sergeant Cashman might have used better judgment and called for the assistance of the Emergency Services Unit. However, with hindsight it is easy to second-guess discretionary decisions. Yet, the fact that in retrospect something might possibly have been done better does not render the original decision actionable.

■ Finally, notwithstanding whatever merit there may be in defendants' procedural objections to holding them liable to plaintiff on the alternate theory of their proprietary duty as landlord, there was no evidence that plaintiff's injuries were proximately caused by the breach of a legal duty owed to him *(Boltax v Joy Day Camp,* 67 NY2d 617, *supra; Derdiarian v Felix Contr. Corp.,* 51 NY2d 308, *supra).* As the court stated in *Iannelli v Powers* (114 AD2d 157, 161, *supra),* "the possessor of realty is not an insurer of the safety of those who enter upon such realty, and, in order to establish the existence of a duty on his part to take minimal protective measures, it must be shown 'that he either knows or has reason to know from past experience "that there is a likelihood of conduct on the part of third persons * * * which is likely to endanger the safety of the visitor" ' ". Thus, in its proprietary capacity, a municipality is under an obligation to take physical care of its property and to prevent ultrahazardous and criminal activity of which it has knowledge or is foreseeable *(Solomon v City of New York,* 66 NY2d 1026, *supra; Benjamin v City of New York,* 64 NY2d 44). The proximate cause of plaintiff's injuries was the explosive device, not the garbage which had collected near the entrance to police headquarters. Since the grounds outside of One Police Plaza are open to the public, and debris is constantly deposited all over the city, no landlord could reasonably maintain such an area so free of litter that a person intent on secreting a bomb could not discover a hiding place for it. It was not foreseeable that an accumulation of garbage, which is a common event, would provide concealment for a bomb, particularly when there was no evidence that there had ever before been a bombing at police headquarters. Therefore, while one must necessarily feel great compassion for plaintiff, there are no grounds for liability by defendants.

Consequently, the judgment of the Supreme Court, New York County (David B. Saxe, J.), entered on May 20, 1987,

which, after a jury verdict and the denial of defendants' motion to set aside the verdict, awarded plaintiff the sum of $1,750,000 plus interest, costs and disbursements, should be reversed, on the law, and the complaint dismissed, without costs or disbursements.

SULLIVAN, J. P., CARRO and ELLERIN, JJ., concur.

Judgment, Supreme Court, New York County, entered on May 20, 1987, unanimously reversed, on the law, and the complaint dismissed, without costs and without disbursements.