■ ANTHONY SENFT et al., Respondents, v CITY OF NEW YORK et al., Appellants.—Order and judgment of the Supreme Court, New York County (Michael J. Dontzin, J.), entered January 11, 1988 and February 2, 1988, respectively, awarding plaintiffs Anthony S. Senft and Carol Senft the sums of

$950,819.17 and $158,469.86, respectively, unanimously reversed, on the law, without costs or disbursements, and the complaint dismissed.

On New Year's Eve 1982, FALN, a terrorist organization, planted bombs in at least four locations in downtown Manhattan and Brooklyn. Plaintiff Anthony S. Senft, a dog handler and member of the New York City Police Department's Bomb Squad, who was at the time waiting to be trained as a bomb technician, and his partner, Officer Pastorella, a bomb technician, were notified by the Police Department's Emergency Services Unit (ESU) that a bomb had exploded at 26 Federal Plaza in Manhattan. When they arrived at the scene, the area surrounding the explosion, which had caused extensive damage, had been cordoned off. At Pastorella's direction, Senft searched the area with the Bomb Squad dog for a secondary device, but none was found. At about that time, a second bomb exploded at Police Plaza, which Senft heard. After receiving a call from police headquarters, Senft and Pastorella proceeded to Police Plaza, there encountering Police Officer Rocco Pascarella, who had been severely injured by the blast. Soon thereafter, a security guard found two suspicious packages which, upon examination, appeared to be two other bombs at St. Andrew's Plaza, which is adjacent to Police Plaza. Senft and Pastorella were summoned.

The bombs were inside paper bags propped up against columns, 20 feet apart. As the police were clearing the area of onlookers, Senft heard a blast and felt the ground shake from a third bomb explosion, this one across the East River in Brooklyn. Senft took the Bomb Squad dog to one of the packages and the dog sat, indicating the possible presence of an explosive device. Pastorella directed that bomb blankets, made of heavy bullet-proof material designed to protect against flying shrapnel, be placed on top of both packages. When the blankets were in place, Pastorella told Senft to get into a bomb suit. Bomb suits, with heavy metal breast and pelvis plates to protect the front of the body, cover the entire body and require assistance in putting on. When an ESU officer brought out the helmets, Pastorella refused to wear his, stating that it fogged. Senft did not wear his helmet either because, as he testified, Pastorella had told him that it was "useless because it was so cumbersome, when you got in it you hyperventilated and it fogged up." Senft had heard the same complaint before that night from other technicians.

As Senft and Pastorella prepared themselves, ESU Officer Pastorino urged Pastorella to leave the bomb until the morn-

ing. Pastorella, however, believed that time was running out and that immediate action was required. He and Senft lifted the bomb blanket from one of the devices, which Pastorella decided to disarm by hand. Remote disarming procedures— where the technician tries to disarm the bomb from a distance —although available, are time consuming and not always appropriate.

As Pastorella approached the bomb, Pastorino, standing some distance behind, held a flashlight. Senft, 1½ feet from the device, was positioned near the tool box, ready to hand Pastorella the necessary tools. As Pastorella bent down, according to Pastorino, "he had like a razor knife in his hand, and as far as I am concerned, he never really got a chance to touch the package. He opened the top of the bag, or attempted to spread the bag apart, and it blew up." Pastorella lost the sight in both his eyes and the use of a hand. Senft sustained injuries to his face, nose, eyes and ears. He has lost the sight in one eye, continues to have ringing in his ears and has become emotionally insecure and unable to enjoy life. He has been unable to return to work. At the time of trial, 4½ years later, he was on sick leave and being paid as a detective, to which position he was promoted after the accident.

After an almost three-week trial of Senft's claims of negligence against the city and the Police Department, the court presented two theories of liability to the jury. It instructed the jury to decide whether it was reasonable to put Senft in close proximity to explosive devices for any purpose, without first training him in how to disarm them. Specifically, the jury was asked to decide whether Senft could make an intelligent judgment in evaluating the situation and the danger presented in assisting Pastorella. This instruction was, in a supplemental charge, extended to the jury's consideration of the issue of Senft's assumption of the risk. After refusing Senft's request to charge that the helmet was defective because of the absence of any such proof and, since Senft never wore the helmet, the lack of proximate cause, the court also charged that the jury could consider whether Senft was properly and sufficiently trained in the use of the helmet, especially in light of his testimony that he was told by Pastorella and other technicians that the helmet was ineffective and using it would be counterproductive because of its fogging problems. The jury, in answering the special interrogatories submitted to it, found that the city failed to train Senft sufficiently and properly for the tasks assigned to him and in use of the helmet, and apportioned liability 60% to defendants

and 40% to Senft, awarding him $2,500,000 and his wife $500,000 on her loss of services claim. The trial court, finding these awards excessive, ordered a new trial on damages unless Senft agreed to accept $1,500,000 and his wife $250,000. Both Senft and his wife agreed to the reduced amounts and a judgment was entered which, after application of the apportionment percentages, awarded Senft $900,000 and his wife $150,000. We reverse and dismiss the complaint.

We note at the outset that the jury, with Senft's consent, was not presented with a theory of liability based on the exercise of poor judgment by his superiors or Officer Pastorella. Such a theory cannot form the basis of municipal liability in the case of a firefighter *(see, Kenavan v City of New York,* 70 NY2d 558, 569) or, for that matter, a police officer injured in the line of duty. Thus, the only theories submitted to the jury related to the city's failure to train Senft in the skills and disciplines necessary to execute his duties and to use his equipment properly. Since there is not a scintilla of evidence that Senft was not qualified to perform all the tasks he was asked to do on the night in question, and in particular the task he was performing at the time the bomb exploded, there was no basis upon which the Trial Judge could send the case to the jury on a theory of failure to train in the skills and disciplines of his assignment. In his testimony, Senft conceded that he was never asked to touch or disarm the device. On this record, it is unrefuted that all that he was asked to do immediately before he was injured was to stand near bomb technician Pastorella ready to hand him tools, if needed. No specialized training is needed for the task of handing tools to a bomb technician. Not one of Senft's experts testified that handing tools to a technician requires special expertise or is part of the "render-safe" procedure, even though doing so requires the assistant, in this case, Senft, to be close to the bomb. In fact, DeCicco, Senft's expert, admitted that the technician asks dog handlers to hand him tools when he is performing render-safe procedures. Senft's experts also testified that technicians in training, before obtaining their specialized training, routinely act as "gofers" for technicians. Senft argues that, at a minimum, a dog handler should be trained to recognize an erroneous procedure. This argument ignores the concession that there was no erroneous procedure and the fact that no theory questioning the decisions of anyone at the scene of the incident was submitted to the jury. We note also that those who elect to join the uniformed services and, in particular, a special unit such as the Bomb

Squad, "do so with knowledge of the dangers attendant upon those occupations and the distinct possibility that they might be hurt in the course of their employment." *(Pascarella v City of New York,* 146 AD2d 61, 69, *lv denied* 74 NY2d 610.) Nor are we unmindful of the great sense of devotion that motivates these officers to undertake such hazardous duty in society's behalf. Nevertheless, it is clear that Senft's training, or lack thereof, in the skills and disciplines of his assignment, i.e., handing tools to the bomb technician, could not have been a proximate cause of the injuries he sustained.

With respect to the issue of the bomb helmet, it is made of heavy ceramic material covering the entire head, including the face and ears. The front has a three-quarter-inch-thick welder's visor that can be moved up and down over the eyes and face. The visor tends to fog, especially in cold weather, and in such conditions, distorts vision. As already noted, the capabilities of the helmet are not in issue since the court refused to submit a defective helmet theory. In any event, the testimony clearly established that the Galt helmet was "state of the art". Plaintiff's own expert conceded that there was no lightweight bomb helmet on the market in 1982 and that both the Galt and Safeco helmets caused fogging and hyperventilation. Even with those experienced in its use, the helmet fogged, especially in cold weather. Moreover, in his bill of particulars, plaintiff never alleged a lack of training in its use. All that was alleged was that the helmet was not suitable for its intended use. The trial court, *sua sponte,* converted the allegation of defect into a different claim. In any event, the new claim should not have been permitted to go to the jury because the proof of causation in fact was deficient as a matter of law. Senft had the burden of proving that, had he been trained in the use of the helmet, he, more likely than not, would have worn the helmet that night. Significantly, Senft himself never testified that had he been so trained he would have worn the helmet. The testimony was that other experienced Bomb Squad technicians did not wear the helmet because of its weight and fogging problems. Pastorella, for instance, described as self-motivated, a perfectionist, decided, despite his training and experience, not to wear the helmet on the night in question. Moreover, Senft's expert, Monaco, a senior bomb technician, testified that he never wore the helmet because it was heavy, fogged up and caused him to hyperventilate. While DeCicco, another of Senft's experts, did testify that proper breathing could prevent fogging, and said he always wore a complete suit, Brodie, the only other expert

to testify about using the helmet, expressed no such opinion. Thus, the jury was asked to speculate as to what Senft would have done had be been trained in the use of the helmet. Senft's lack of such training and reliance on Pastorella's decision not to wear the helmet do not establish that he would have worn the helmet had be been trained. He might just as easily have agreed with Pastorella and Monaco and not worn the helmet that night. On such a record, the evidence on the point does not preponderate in Senft's favor. "A jury verdict must be based on more than mere speculation or guesswork". *(Bernstein v City of New York,* 69 NY2d 1020, 1021.)

In such circumstances, defendants' motion for judgment notwithstanding the verdict should have been granted. The appeal from the order determining that motion, as well as the motion to set aside the verdict, is dismissed as subsumed in the appeal from the judgment. Concur—Sullivan, J. P., Carro, Ellerin and Wallach, JJ.