■ SUSAN McCORMACK, as Administratrix of the Estate of JOSEPH McCORMACK, Deceased, Respondent, v CITY OF NEW YORK, Appellant.—Judgment, Supreme Court, Bronx County (Lewis R. Friedman, J.), entered July 18, 1989, which awarded plaintiff the sum of $3,676,608.91, inclusive of interest, reversed, on the law, and the complaint is dismissed, without costs. The Clerk is directed to enter judgment in favor of defendant-appellant dismissing the complaint.

Given that Officer McCormack was killed by shotgun pellets that pierced his shoulder and upper side underneath his arm, we understand plaintiff's first theory of liability to be that defendant-City was under a duty to provide its Emergency Service Unit personnel with a vest that afforded protection to these areas. Defendant did not need input from its ESU personnel, and the jury did not need input from experts, to appreciate that the Davis vest, concededly state of the art when purchased by defendant in the late 1960's, was not designed to provide protection to these areas of the body. This deficiency, if such it be considered, was obvious and apparent, no less to defendant-employer than to the policemen-employees who wore the vest, defendant acknowledging that for this and a variety of other reasons it had been actively searching

for a better vest for at least several years prior to the incident. Is the City to be held liable for not having procured a new vest by the time of the incident? Despite the sympathetic nature of plaintiff's claim, based as it is upon the death of a police officer killed in the line of duty, under prevailing law we are constrained to answer in the negative. Even if we were to assume in plaintiff's favor, and it is a generous assumption, that a newer model vest suitable for ESU purposes in barricade situations could have been procured which would have saved Officer McCormack's life, the failure to procure such a vest was, at worst, an error of judgment for which defendant cannot be held liable given uncontroverted evidence that, at the time of the incident, the Davis vest was being used in barricade situations by the DEA, FBI and Secret Service, and had met the standards established that very year by the U.S. Department of Justice for law enforcement ballistic armor. Also significant is the absence of proof that a vest affording more protection was in use at the time of the incident by any other ESU-type division in the United States, and the unblemished record of the Davis vest in protecting ESU personnel from barricaded individuals during the twelve to fifteen years that it was in use by defendant prior to the incident (*Cleary v Dietz Co.*, 222 NY 126; *Harley v Buffalo Car Mfg. Co.*, 142 NY 31; *Sisco v Lehigh & Hudson Riv. Ry. Co.*, 145 NY 296).

Plaintiff's second theory of liability turns on the second of two "no-shoot" orders given by the ESU commander at the scene. According to plaintiff, the first order was to the effect that ESU personnel were not to return fire if shot at by the perpetrator from inside of the barricaded house; the second order, issued after the perpetrator had twice presented himself on the porch for several moments before reentering the house, was to the effect that ESU personnel were not to return fire even if shot at from the porch. At trial, defendant, admitting issuance of the first order but denying the second, argued, as it continues to do on appeal, that any orders given not to shoot should not have been understood by ESU personnel as prohibiting use of their weapons if necessary to save life.

We assume, in plaintiff's favor, that an order was given which, properly understood, was to the effect that ESU personnel were not to fire their weapons under any circumstances even if shot at from the porch. That being so, we understand plaintiff's theory to be that ESU personnel are under a standing order not to shoot unless necessary to save life; that

it is standard, albeit unpublished, ESU procedure for each ESU member to decide for himself whether it is necessary to shoot in order to save life; that the no-shoot order given here deprived individual ESU members of this discretion to shoot, and thereby departed from an "immutable" ESU procedure; and that an ESU sharpshooter team deployed on a nearby rooftop, whose very responsibility was to observe and report movement and protect ESU personnel on the ground, would have shot the barricaded individual when he came onto the porch a third time and then shouldered his shotgun just before shooting Officer McCormack, had the sharpshooter not felt himself constrained by this no-shoot order.

The problem with this theory is that the evidence was simply insufficient to show the existence of any such immutable rule or procedure prohibiting an ESU commander at a barricade situation from ordering his people not to shoot. To say, as plaintiff's witnesses did, that they had never heard such an order before, that it left them confounded as to what they were to do if necessary to shoot even in self-defense, and that, given the circumstances at the scene, it contravened basic principles of safety, is not to say that it contravened an immutable rule which must obtain regardless of the circumstances *(compare, Vyse v City of New York,* 144 AD2d 452). Not one of plaintiff's witnesses challenged defendant's basic rationale that friendly fire can pose a threat to friendly personnel in a barricade situation depending upon a host of logistical and tactical factors and considerations, including the configuration of the deployment in and around the barricade, the structure and layout of the barricade, and the nature of the weapons in the hands of friendly personnel, and that given such a threat a no-shoot order would be appropriate. Indeed, one of plaintiff's witnesses testified that the first order not to return fire from inside the house was a legitimate exercise of judgment given a threat from friendly fire; if that be so, we simply do not see why the same would not be true of the second order not to return fire from the porch. At best, plaintiff's evidence can be taken to mean that the circumstances did not present such a threat, or that if they did, command was at fault for permitting the threat to arise in the first place, but for such errors of judgment defendant cannot be held liable *(Kenavan v City of New York,* 70 NY2d 558, 569). Concur—Wallach, J. P., Asch and Smith, JJ.

Kassal, J., dissents in part in a memorandum as follows: I am in agreement with the majority with respect to plaintiff's failure to prove a *prima facie* case of negligence on the basis

of the "no shoot" order. The order, issued by Police Chief Lowe in this emergency hostage situation, was a decision requiring the type of judgment for which police officers are specially trained, and its soundness in the particular circumstances presented should not have been subjected to second-guessing by the jury. *(Senft v City of New York,* 159 AD2d 370, *lv denied* 76 NY2d 704; *see, Pascarella v City of New York,* 146 AD2d 61, 71-72, *lv denied* 74 NY2d 610.)

I respectfully dissent, however, from that portion of the majority decision which reverses the judgment and dismisses the complaint with respect to plaintiff's claim that the bullet-proof vest provided to the decedent was not reasonably safe.

The record establishes that defendant conceded, by stipulation dated February 18, 1987, that it had been put on notice, prior to the incident which resulted in Joseph McCormack's death, that the bulletproof vest used by the Emergency Services Unit (ESU) was unsuitable for its intended purposes. Known as the Davis Model 6003-3, the vest was designed to leave the body's sides exposed in order to ensure "maneuverability". It was uncontroverted that Officer McCormack was wearing the Davis vest that had been issued to him when he was shot by a deranged individual, and that the points of entry of the over 120 pellet wounds which resulted in his death were in the exposed areas under his left arm and his back. The shotgun wounds sustained by McCormack were to the aorta, lungs, diaphragm and spleen.

Although an employer may not be liable for an injury to an employee solely on the ground that he has not supplied the newest, safest, and best equipment *(see, Cleary v Deitz Co.,* 222 NY 126), it is an employer's duty to provide its employees with equipment that is safe, sound, and suitable for the intended use. *(MacClave v City of New York,* 24 AD2d 230, *affd* 19 NY2d 892.) In the case at bar, there was uncontroverted evidence that at least two other of the bulletproof vests then in existence afforded protection to the areas where Officer McCormack received his fatal wounds. Moreover, Chief Lowe conceded in his testimony that the Davis vest was unsuitable for ESU's particular use because of the body areas left unprotected, and that he had been aware of this for at least one to two years prior to McCormack's death. In addition, the record reveals that William Donovan, an expert in the development and manufacture of protective body gear, had offered, as early as 1975, to modify the police department's supply of Davis vests by providing Keflar attachments

that would cover the exposed areas without restricting arm mobility.

Thus, this claim did not involve impermissible second-guessing with respect to the professional judgment required to determine which vest was most suitable for the intended use. Rather, the issue before the jury was whether the defendant had breached its duty, as an employer, to provide equipment that would afford the protection for which it was issued and intended. *(MacClave v City of New York, supra,* at 232.) The jury determined that this duty had, in fact, been breached and the record does not, in my opinion, support a finding that there was "no valid line of reasoning and permissible inferences which could possibly lead rational men to the conclusion reached by the jury on the basis of the evidence presented at trial". *(Cohen v Hallmark Cards,* 45 NY2d 493, 499.)